**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| In re: | : Chapter 11 |
| SEPCO CORPORATION, | : Case No. 16-50058 |
| Debtor.[1] | : Judge Alan M. Koschik |

# DECLARATION OF RICHARD J. SZEKELYI IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PAPERS

Pursuant to 28 U.S.C. § 1746, Richard J. Szekelyi declares as follows:

1. I am the Chief Restructuring Officer of Sepco Corporation (the "Debtor," the "Company," or "Sepco"), a corporation organized under the laws of the State of California with its principal place of business in Aurora, Ohio. In my capacity as the Chief Restructuring Officer, I have become familiar with the financial condition, books and records, and business affairs of the Debtor. I submit this Declaration in support of the Company's Chapter 11 petition filed as of the date hereof (the "Petition Date") and first-day motions (collectively, the "First-Day Papers").

2. Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information, and belief based upon my personal knowledge, my review of relevant documents maintained in the ordinary course of the Company's business, and information provided to me by the Company's management or professionals working with me or under my supervision. I am authorized to submit this Declaration on behalf of the Company, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

[1] The last four digits of the Debtor's federal tax identification number are 7402.

3. Sepco was a family-owned company originally incorporated in 1933. In 1981, Sepco's stock was acquired by another company for approximately $8.2 million. In 1995, Sepco ceased active business operations. As a result of certain asbestos-containing products that it had previously made, however, Sepco became embroiled in the asbestos litigation. Although Sepco had limited resources of its own, it did have substantial insurance coverage that enabled it to address that litigation for a significant period of time. Over the years, Sepco paid a total of some $120 million in settlement and defense costs, of which some $75 million was funded by its insurers and the remaining $45 million from Sepco's own financial assets. As a result of these payments, all of Sepco's primarily liability insurance coverage, and much of its excess liability insurance coverage, has been exhausted. At present, Sepco is receiving payments under only one of its insurance policies, and that policy pays only a small percentage of Sepco's settlement and defense costs. Sepco also has three additional remaining insurance policies with $40 million in total limits that were issued by affiliates of the Hartford insurance group, but Hartford is not presently making any payments toward Sepco's costs based on Hartford's position – which Sepco disputes – that none of its policies have been triggered. As a result, Sepco's own financial assets have declined to approximately $4.5 million, as of December 31, 2015. Accordingly, Sepco has filed for bankruptcy protection to preserve and liquidate its remaining assets, including its rights under the Hartford insurance policies, and to confirm a plan that would provide an equitable distribution of those assets.

4. As a result of the commencement of the Company's Chapter 11 case, the Company has requested various types of relief in the First-Day Papers. The First-Day Papers seek relief to establish certain other administrative procedures to promote a smooth transition

16-50058-amk Doc 16 FILED 01/14/16 ENTERED 01/14/16 17:17:43 Page 2 of 13

into Chapter 11. The relief requested in the First-Day Papers is in the best interest of the Company, its creditors, and estate.

5. To familiarize the Court with the Company and the relief requested in the First-Day Papers, this Declaration is organized as follows: Section I describes the nature of the debtor's business and circumstances leading to the Chapter 11 case; and Section II incorporates and affirms the facts that support the relief requested in the First-Day Papers.

## I. NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASE

### A. Equity

6. All of the Company's outstanding common stock is owned by Saint-Gobain Performance Plastics Corporation ("SG Plastics"), a non-Debtor entity. There is no public market for the Company's equity securities.

### B. History of the Debtor and its Business

7. The Company is a legal entity incorporated under the laws of the State of California, with its principal place of business in Aurora, Ohio.

8. The Company began its operations as a family-owned enterprise in 1924, under the name Southeastern Products Company, and was located in Birmingham, Alabama. It was originally incorporated under the laws of Alabama in 1933, under the name Southeastern Products Corporation. In 1968, Southeastern Products Corporation changed its name to Sepco Corporation.

9. In 1977, the Company acquired the stock of a Houston, Texas company known as Crow Industries, Inc., whose name was thereupon changed to Sepco Metallic Gasket Company. In 1978, Sepco Metallic Gasket Company dissolved and distributed all of its assets to Sepco, which, as a result, thereafter had operations in Alabama and Texas.

10. In 1981, the Company's capital stock was acquired by The Fluorocarbon Company ("Fluorocarbon") for a purchase price of $8,225,150, and the Company thereby became a wholly-owned subsidiary of Fluorocarbon. In 1982, the Company also changed its state of incorporation to California. In 1990, Fluorocarbon (the Company's then-parent company) changed its name to Furon Company ("Furon"). In 1985, Sepco sold its Birmingham, Alabama plant to Sealing Equipment Products Co. ("Sealing Equipment"), an unaffiliated company, in an asset purchase transaction. Pursuant to the Asset Purchase Agreement, Sepco Corporation retained all asbestos liabilities arising from or relating to the operation of the Birmingham plant prior to the closing date, and Sepco agreed to indemnify Sealing Equipment from such asbestos claims and liabilities.

11. In 1995, Sepco sold its remaining operating assets for $15,000,000, and the Company has not engaged in any active manufacturing or sales activities since that time. Instead, it has managed its financial and insurance assets and, as described below, its asbestos-related and other liabilities.

12. In October 1999, Furon (Sepco's then-parent company) was acquired by a subsidiary of Saint-Gobain Corporation ("SG Corp."), and Sepco thereby became an indirect, wholly-owned subsidiary of SG Corp. Specifically, Furon's capital stock was acquired by FCY Acquisition, Inc. ("FCY"), a wholly-owned subsidiary of Saint-Gobain Ceramics & Plastics, Inc. ("SG Ceramics"), which itself was a wholly-owned, indirect subsidiary of SG Corp. FCY was subsequently merged into Furon, Furon thereby became a wholly-owned subsidiary of SG Ceramics, and Furon's name was changed to SG Plastics.

### C. The Company's Liabilities

13. Prior to its bankruptcy filing, the Company was named as a defendant in a substantial number of personal injury and wrongful death claims allegedly based on asbestos-

containing products that the Company had sold ("Asbestos PI Claims"). The vast majority of those claims allegedly arose from the Company's sale of certain asbestos-containing packing and gasket products until approximately 1984, and its sale of certain asbestos-containing spiral-wound or semi-metallic gaskets until approximately 1992.

14. The Company was first sued as a defendant in Asbestos PI Claims sometime in the late 1970's. Subsequently, following the bankruptcies of companies that had been major suppliers of asbestos and asbestos-containing products, litigants increasingly pursued claims against second- and third-tier suppliers of products that had any asbestos content, including the Company. By the end of 2015, the total number of claims that had been filed against the Company since the inception of the litigation exceeded 195,000. As a result, Sepco has incurred increasingly large costs for the defense and, where appropriate, settlement of Asbestos PI Claims. The Company's defense of these claims has included trying a half-dozen cases to verdict, all of which resulted in defense verdicts. The vast majority of the claims brought against the Company – a total of more than 118,000 claims by the end of 2015 – have been dismissed as to the Company pre-trial, without any payment. As of the Petition Date, the Company has approximately 4,816 active pending Asbestos PI Claims against it. There are also approximately 32,238 Asbestos PI Claims that technically are pending against the Company but that the Company considers to be inactive either because they have been placed on a formal inactive-case docket (in Mississippi, Ohio, Pennsylvania and Texas) or because a substantial time has lapsed without any action in the case. The Company also has agreed to settle 58 other Asbestos PI Claims for a total amount of $39,450; these settlements have not been paid because the Company has not received all of the required documents from those claimants. In addition, Sealing Equipment has tendered to Sepco a number of asbestos-related claims filed against Sealing

Equipment, along with notice to Sepco of Sealing Equipment's position that the claims fall within the category for which Sepco agreed to defend and indemnify Sealing Equipment.

15. The Company's total defense and indemnity costs to date have totaled to approximately $120 million. Over time, the Company's defense costs have substantially exceeded its indemnity costs. By the end of 2015, the Company had incurred and paid defense costs totaling approximately $85 million, almost $49 million of which was paid during the ten years from 2006 through 2015. In addition, by the end of 2015, the Company had settled and paid almost 40,000 claims for indemnity settlements totaling over $35 million, almost $18 million of which was paid during the ten year from 2006 through 2015.

16. The following chart lists, for each of the past ten years, the number of new claims filed against the Company, the number of claims dismissed, the number of claims settled, the total number of claims resolved, the amount of indemnity costs paid, and the amount of defense costs paid:

| YEAR | CLAIMS FILED | CLAIMS DISMISSED | CLAIMS SETTLED | TOTAL CLAIMS RESOLVED | INDEMNITY COSTS | DEFENSE COSTS |
|---|---|---|---|---|---|---|
| 2006 | 4,909 | 19,660 | 273 | 19,933 | $1,355,625 | $6,085,498 |
| 2007 | 2,247 | 2,100 | 241 | 2,341 | $1,357,100 | $5,357,572 |
| 2008 | 1,278 | 3,185 | 283 | 3,468 | $2,048,026 | $4,895,938 |
| 2009 | 863 | 8,764 | 104 | 8,868 | $1,215,700 | $4,456,806 |
| 2010 | 1,183 | 1,567 | 124 | 1,691 | $1,207,850 | $4,937,399 |
| 2011 | 1,309 | 1,803 | 141 | 1,944 | $986,500 | $4,682,667 |
| 2012 | 1,124 | 2,172 | 213 | 2,385 | $3,434,850 | $4,346,259 |
| 2013 | 921 | 921 | 233 | 1,154 | $3,955,150 | $4,303,886 |
| 2014 | 824 | 11,087 | 122 | 11,209 | $1,193,900 | $4,786,821 |
| 2015 | 862 | 1,171 | 123 | 1,294 | $1,014,400 | $4,796,831 |
| Total | 15,520 | 52,430 | 1,857 | 54,287 | $17,769,101 | $48,649,678 |

17. The Company's only other known potential significant liabilities are to the attorneys who represent the Company in asbestos litigation and to PACE/Navigant Consulting, which performs reporting and data management services relating to the Company's asbestos

litigation. However, the Company has retainer agreements in place with most of its defense counsel and hence expects only relatively nominal liability to some counsel and other vendors. The Company will determine whether any of those attorneys are in possession of retainer amounts exceeding the value of their unpaid services rendered to the Company prior to the filing of the petition.

**D. The Company's Assets, Including Insurance Coverage**

18. As described above, the Company has incurred costs of approximately $120 million to defend and settle Asbestos PI Claims. With the increasing exhaustion of its insurance coverage and with the Hartford companies' position that their insurance policies have not yet been triggered, the Company has been required to fund some $45 million of that amount from its own financial assets. As a result, as of the Petition Date, the Company has funds in its bank accounts totaling approximately $4.5 million, as of December 31, 2015.

19. The Company has been covered by a Tax Sharing Agreement between Saint-Gobain Corporation and its subsidiaries, under which the Company has received any tax benefits actually realized by the Saint-Gobain Corporation corporate group on its consolidated income tax returns as a result of the Company's operating losses, with such amount being paid to the Company in the quarter following the realization of the tax benefit. Pursuant to that agreement, the Company received over $6.9 million in tax benefits from its parent company, SG Plastics, from 2013-2015. In addition, under that agreement, the Company may receive an additional tax benefit payment from SG Plastics in or about March of 2016 based on the Company's negative net income during the fourth quarter of 2015, depending on a number of legal and factual issues. With respect to future periods, it is possible that the Company may receive additional amounts under the Tax Sharing Agreement, depending on the Company's status within the Saint-Gobain Corporation corporate group for tax purposes, whether the Company has negative net income,

the net income of the Saint-Gobain Corporation corporate group other than the Company, and applicable tax laws and regulations. The existence and amount of such benefits, if any, can be determined only following the applicable quarterly tax calculations.

20. From 1970 to 1981, the Company obtained primary and excess comprehensive general liability ("CGL") insurance policies. Those policies were issued by Employers' Liability Assurance Corp., Employers' Commercial Union Ins. Co. of America, Commercial Union Ins. Co., Home Ins. Co., Home Ins. Co. of Indiana, Mission Ins. Co., Continental Casualty Co., United National Ins. Co., American Employers' Ins. Co., Reserve Ins. Co., First State Ins. Co., and Interstate Fire & Casualty Co. In addition, from 1982 through 1991, the Company was covered by CGL insurance policies obtained by its parent corporation, Fluorocarbon. That coverage was issued by Fireman's Fund Ins. Co., Industrial Underwriters Ins. Co., Transportation Ins. Co., Continental Casualty Ins. Co., Twin City Fire Ins. Co., Industrial Indemnity, Transcontinental Ins. Co., First State Ins. Co., Forum Ins. Co., Associated International Ins. Co., Integrity Ins. Co., Covenant Mutual Ins. Co., and National Union Fire Ins. Co.

21. The CGL policies are "occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that result in bodily injury or property damage during the applicable policy period, even if the injury or damage does not manifest itself until after the policy period. The pre-1986 "occurrence" policies provide insurance coverage for asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have occurred.

22. In total, from 1967 to 1985, the Company had potential CGL insurance coverage for Asbestos PI Claims with combined limits of more than $158 million. Each policy appears to

contain per-occurrence and annual aggregate limits of liability and may only cover claims to the extent any applicable lower level insurance for the covered period is or becomes exhausted. As a general matter, primary policies respond to claims first, then umbrella or first-layer excess policies, followed in particular years by second-layer excess policies. As noted above, since the inception of its asbestos litigation, the Company has received over $75 million under its insurance policies that was used to fund the indemnity and defense payments that the Company made in connection with Asbestos PI Claims.

23.     As a result of those payments, all of the Company's primary CGL coverage has been exhausted. Of the Company's excess CGL coverage potentially applicable to Asbestos PI Claims, all but four policies have been exhausted (through payments and/or settlements) or involve insolvent insurers. The Company has coverage for Asbestos PI Claims under a 1982 policy issued by Fireman's Fund Ins. Co. that provides $15 million in coverage in excess of $500,000 in underlying coverage. Pursuant to agreement, this Fireman's Fund policy is presently paying approximately 2.6% of the Company's defense costs and 3.9% of the Company's indemnity costs for Asbestos PI Claims.

24.     In addition, the Company potentially has coverage for Asbestos PI Claims under three policies issued by affiliates of the Hartford insurance group: a 1983-1984 policy issued by Twin City Ins. Co. that provides $10 million in coverage in excess of $15.5 million in underlying coverage, a 1984-1985 policy issued by Twin City Ins. Co. that provides $25 million in coverage in excess of $25.5 million in underlying coverage, and a 1985-1986 policy issued by First State Ins. Co. that provides $5 million in coverage as a part of a block of $8 million in coverage in excess of $11.5 million in underlying coverage. The Company's position is that the first and third of these policies have already been triggered, and that the Company is owed substantial

sums under those policies. Hartford, however, contends that none of the policies has yet been triggered and hence that the Company is not entitled to payment under those policies at this time for the Company's asbestos-related defense or indemnity payments. Accordingly, the Company has not received any payments under those policies. The Company has invoked arbitration, and that arbitration proceeding is pending.

### E. Circumstances Leading to the Company's Chapter 11 Case

25. The Company's costs to settle and defend Asbestos PI Claims continue to be substantial, and they exceed the amounts that the Company is receiving under the Fireman's Fund insurance policy and under the Tax Sharing Agreement. This has placed significant pressure on the Company's ability to manage its liabilities.

26. In light of these entire circumstances, the Company determined that it is necessary to commence a case under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") to preserve and liquidate its remaining assets, including its rights in and potential recoveries under the Hartford insurance policies, and to confirm a plan of reorganization that would provide for an equitable distribution of those assets to persons holding meritorious Asbestos PI Claims and any other creditors.

## II. FIRST-DAY PAPERS

27. Concurrently with the filing of this Chapter 11 case, the Debtor filed a number of First-Day Papers.[2] The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case, at which the Court will hear the First-Day Papers. The First-Day Papers are generally designed to facilitate the establishment of certain administrative procedures

---

[2] Capitalized terms not defined in the sections below have the meanings ascribed to them in the applicable First-Day Paper.

to promote a smooth transition into Chapter 11. The background in support of the salient First-Day Papers is provided below:

**A. Application for Order Authorizing and Approving the Retention and Employment of Buckley King LPA as Bankruptcy Counsel**

The Debtor requests the issuance and entry of an order appointing Buckley King LPA ("BK") to act as the Debtor's bankruptcy counsel. As set forth in the accompanying declaration of Harry W. Greenfield, Esq., BK (1) has the experience, expertise, and qualifications necessary to serve as bankruptcy counsel in this case and (2) is a "disinterested" person within the meaning of Section 101(14) of the Bankruptcy Code.

**B. Application to Employ PMCM, LLC as Financial Advisors**

The Debtor requests the issuance and entry of an order appointing PMCM, LLC, an affiliate of Phoenix Management Services, LLC (referred to herein as "PMCM"), as the Debtor's financial advisors, including to have Richard Szekelyi serve as the Debtor's Chief Restructuring Officer . As set forth in my separate declaration in support of that application, the Debtor believes that PMCM is well-suited for this role based on its prior experience in similar matters. In addition, PCMC is a "disinterested" person within the meaning of Section 101(14) of the Bankruptcy Code.

**C. Application for Entry of Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Notice, Balloting, and Claims Agent**

28. The Debtor also requests the issuance and entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") to act as the official Claims Agent of the Clerk of the Bankruptcy Court in order to assume full responsibility for the distribution of notices and proofs of claim, and maintenance, processing and docketing of proofs of claim filed in the Debtor's Chapter 11 case, and to provide such additional services as are described in more detail in the

motion. Based on KCC's substantial experience in providing similar services in other large Chapter 11 cases, including noticing, claims processing and reconciliation, and plan voting and distribution services, I believe that KCC is qualified to serve as Claims, Noticing and Balloting Agent in this Chapter 11 case. In addition, I believe that the Debtor's estate, creditors, parties-in-interest, and this Court will benefit as a result of KCC's experience and cost-effective methods.

**D. Motion for Entry of Order Authorizing (I) The Debtor to File a List of the 35 Law Firms Representing the Largest Number of Open Asbestos Claims in Lieu of Filing a List of the Persons Holding the 20 Largest Unsecured Claims; (II) The Debtor to List Addresses of Counsel for Asbestos Claimants in Creditor Matrix, in Lieu of Claimants' Addresses and (III) Certain Notice Procedures for Asbestos Claimants**

29. The Debtor seeks entry of an order authorizing it (i) to file a list of the 35 asbestos plaintiff firms with the largest number of open pending asbestos cases against the Debtor, in lieu of filing a list of the persons holding the 20 largest unsecured claims, (ii) to list addresses of counsel for asbestos claimants in the creditor matrix in lieu of the mailing addresses of the asbestos claimants themselves, and (iii) to implement procedures by which the Debtor will send required notices, mailings and other communication related to this Chapter 11 case to the asbestos claimants in care of their counsel of record at such counsel's address. The grounds for this request are set forth in the separate motion papers.

**E. Motion to for an Order Authorizing Debtor to (A) Maintain Existing Bank Accounts, (B) Continue Using Existing Checks, and (C) Granting a Limited Waiver of the Deposit Guidelines Set Forth in 11 U.S.C. § 345**

30. The Debtor seeks entry of an order authorizing it to maintain existing bank accounts at JPMorgan Chase Bank and PNC Bank (both of which are included on the Office of U.S. Trustee's list of approved depositories), to continue using its existing checks, and granting a limited waiver of the deposit guidelines set forth in section 345. Granting such relief will

facilitate a smooth transition of the Debtor into chapter 11 and minimize expense to the estate. Further grounds for this request are set forth in the separate motion papers.

**F. Debtor's Application to Retain and Compensate Certain Ordinary Course Professionals**

31. The Debtor seeks an order authorizing it to retain and compensate, in the ordinary course and without the necessity of formal applications and further orders of the Court, law firms and related professionals who have been defending the Debtor against the Asbestos PI Claims in various courts throughout the United States. The Debtor anticipates that there may be some minimal amount of work that these "ordinary course professionals" may have to perform related to monitoring the Asbestos PI Claims to which the Debtor is a party and ensuring that the stay of such litigation resulting from the filing of its chapter 11 petition is honored. Because any of the services rendered by these professionals would not be directly connected to this bankruptcy case, their services will in no way duplicate any services to be provided by the Debtor's chapter 11 professionals. It would be costly, time-consuming, and administratively cumbersome for the Debtor and the Court to require that each "ordinary course professional" apply separately for approval of its employment and compensation. Accordingly, the Debtor requests the authority to retain and compensate them without further order of the Court.

I declare under penalty of perjury that the foregoing is correct.

Dated: January 14, 2016

Richard J. Szekelyi

1896449_2